UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>v.<br><br>BGL BNP PARIBAS S.A., BNP PARIBAS ARBITRAGE SNC, BNP PARIBAS BANK & TRUST CAYMAN LIMITED, BNP PARIBAS S.A., and BNP PARIBAS (SUISSE) S.A.,<br><br>    Defendants. | Adv. Pro. No. 12-01576 (CGM) |

**MEMORANDUM DECISION GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

**A P P E A R A N C E S :**

*Attorneys for the BNP Defendants*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
By:    Thomas S. Kessler
       Roger A. Cooper
       Ari D. MacKinnon

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of Bernard*
*L. Madoff Investment Securities LLC and the Chapter 7*
*Estate of Bernard L. Madoff*
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
By:    Joanna F. Wasick
       David J. Sheehan
       Torello H. Calvani
       Matthew B. Friedman

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

Pending before the Court is the motion of the defendants, BNP Paribas S.A. ("**BNP**

**Paribas SA**"), as successor in interest to BNP Paribas Securities Services S.C.A. ("**BNP Paribas**

**Securities Services**") and BNP Paribas Securities Services – Succursale de Luxembourg ("**BNP**

**Paribas Securities Services Luxembourg**"), BNP Paribas Arbitrage SNC ("**BNP Arbitrage**"),

and BNP Paribas Bank & Trust Cayman Limited ("**BNP Cayman**"), BGL BNP Paribas S.A.

("**BGL BNP Paribas**"), individually and as successor in interest to BNP Paribas Luxembourg

S.A; and BNP Paribas (Suisse) S.A., ("**BNP Paribas Suisse**") individually and as successor in

interest to BNP Paribas Private Bank (Switzerland) S.A. and United European Bank

(collectively, the "**Defendants**" or "**BNP Defendants**") to dismiss the second amended

complaint of Irving Picard, the trustee ("Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") seeking to recover subsequent transfers allegedly

consisting of BLMIS customer property.  Defendants seek dismissal for lack of personal

jurisdiction as to three defendants, for failure to allege avoidability of the initial transfers, and for

failure to allege that it received BLMIS customer property.  Defendants argue that certain new

claims in the second amended complaint are time-barred under § 550(f) of the Bankruptcy Code. Defendants assert the affirmative defense of "good faith" and the safe harbor provision of the Bankruptcy Code. The Court heard arguments on March 27, 2024.[1] For the reasons set forth herein, the motion is GRANTED in part and DENIED in part.

## JURISDICTION

This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York (the "District Court") as Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al., No. 08-CV-10791, and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). Personal jurisdiction has been contested by certain Defendants and will be discussed below.

## BACKGROUND

The Court assumes familiarity with the background of the BLMIS Ponzi scheme and its SIPA proceeding. *See Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 178–83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

This adversary proceeding was filed on May 4, 2012. (Compl., ECF[2] No. 1) (the "Original Complaint"). Via the second amended complaint (the "Second Amended Complaint"),

---

[1] On March 2, 2024, two defendants, BGL BNP Paribas S.A. and BNP Paribas (Suisse) S.A. agreed to rest on their papers. (Stip., ECF No. 218).
[2] Unless otherwise indicated, all references to "ECF" are references to this Court's electronic docket in adversary proceeding 12-01576-cgm.

the Trustee seeks to recover over $111 million in customer property transferred to the BNP

Defendants and the Resting Defendants from Fairfield Sentry Limited ("Fairfield Sentry"),

Fairfield Sigma Limited ("Fairfield Sigma" and with Fairfield Sentry, the "Fairfield Funds"),

Rye Select Broad Market XL Fund LP ("Rye XL Fund LP"), Rye Select Broad Market Portfolio

Limited ("Rye Portfolio Limited"), and Rye Select Broad Market XL Portfolio Ltd. ("Rye XL

Portfolio Ltd.," and with Rye XL Fund LP and Rye Portfolio Limited, the "Tremont Funds").

(Second Am. Compl. ¶ 6, ECF No. 191).

<u>The Feeder Funds</u>

Fairfield Sentry was a feeder fund of BLMIS, meaning that it held "customer accounts

with BLMIS, and invested substantially all of its asset with BLMIS." (*Id.* ¶ 55).  Fairfield Sigma

was an indirect feeder fund, meaning that it accepted payments in Euros, converted those funds

into U.S. Dollars, and then invested all of the money in Fairfield Sentry.  (*Id.* ¶ 56).  Fairfield

Sigma also received funds from BLMIS through Fairfield Sentry.  (*Id.* ¶ 57).

The Second Amended Complaint alleges that the Fairfield Funds were "created, operated,

and controlled by [the Fairfield Greenwich Group] in New York."  (*Id.* ¶ 59).  The Fairfield

Greenwich Group ("FGG") is an alleged New York-based de facto partnership with offices and

employees in New York.  (*Id.* ¶¶ 59–60).  Until 2003, FGG purported to manage the Fairfield

Funds out of New York.  (*Id.* ¶ 61).  After 2003, FGG designated a Bermuda entity ("FG

Bermuda") as manager despite operations continuing operations from FGG's offices in New

York.  (*Id.*); (*see also id.* ¶ 62) ("Except for administrative assistants, all FG Bermuda employees

reported directly to FGG personnel in New York, and certain of FG Bermuda's officers and

directors were physically located in New York.").  Subscriptions into the Fairfield Funds were

approved or rejected by partners of FGG in New York.  (*Id.* ¶ 62).  Investors in the Fairfield

Funds allegedly agreed to send subscription payments to a New York bank account with HSBC

Bank USA in New York.  (*Id.* ¶ 65).

The Second Amended Complaint also alleges that the Tremont Funds not only fed

investments into BLMIS but that their "very existence" depended on its investments with

BLMIS.  (*Id.* ¶¶ 171, 201–04).  Each of the Tremont Funds here allegedly "invested all or

substantially all of [their] funds indirectly in BLMIS."  (*Id.* ¶¶ 71–73).  The Tremont Funds were

managed and operated by Tremont Group Holdings, Inc., a Delaware corporation, and Tremont

Partners, Inc., a Connecticut corporation (the "Tremont Managers"), which had headquarters in

Rye, New York.  (*Id.* ¶¶ 74, 76).  Tremont Funds employees in New York purportedly

communicated with potential investors and reviewed subscriptions and redemptions.  (*Id.* ¶¶ 77–

79).  Tremont Manager employees in New York signed customer agreements with BLMIS on

behalf of the Tremont Funds.  (*Id.* ¶ 79).

Investors in the Tremont Funds agreed to send subscription payments and redemption

requests to Tremont Partners, Inc., or to a Bank of New York entity in New York.  (*Id.* ¶¶ 82–

83).  All redemption made by Tremont since 2006 were paid in U.S. Dollars from bank accounts

in New York.  (*Id.* ¶ 84).

Following BLMIS's collapse, the Trustee filed an adversary proceeding against Fairfield

Sentry and other feeder funds to avoid and recover fraudulent transfers of customer property in

the amount of approximately $3 billion.  (*Id.* ¶ 213).  In 2011, the Trustee settled with Fairfield

Sentry.  (*Id.* ¶ 215).  As part of the settlement, Fairfield Sentry consented to a judgment in the

amount of $3.054 billion, (Consent J., 09-01239-cgm, ECF No. 109) of which only $70 million

was repaid to the BLMIS customer property estate.  The Trustee then commenced a number of

adversary proceedings against subsequent transferees, like Defendant, to recover the approximately $3 billion in missing customer property.

<u>The Defendants</u>

BNP Paribas SA is the parent company of and "successor in interest to . . . BNP Paribas Securities Services . . . and . . . BNP Paribas Securities Services Luxembourg . . . ." (Second Am. Compl. ¶¶ 88–89); (*see also* Hr'g Tr. 45:9–25, ECF No. 220).  BNP Paribas Securities Services was incorporated under French law and maintains offices in Paris, France, New York, New York; and George Town, Grand Cayman, Cayman Islands.  (Second Am. Compl. ¶ 88).  BNP Paribas Securities Services Luxembourg was incorporated under French law and maintains offices in Hesperange, Luxembourg.  (*Id.* ¶ 89).

BNP Arbitrage is a general partnership incorporated under French law as a *société en nom collectif*.  With offices in Paris, France and New York, New York. (*Id.* ¶ 86).  It is a wholly owned subsidiary of BNP Paribas, which is also BNP Paribas Arbitrage's managing director. (*Id.*).

BNP Cayman is Cayman Islands entity with offices in George Town, Grand Cayman, Cayman Islands.  (*Id.* ¶ 87).  It is a wholly owned subsidiary of BNP Paribas  (*Id.*).

BGL BNP Paribas is a *société anonyme* incorporated and organized under the laws of Luxembourg, and is located in Luxembourg, Luxembourg.  (*Id.* ¶ 85).

BNP Paribas Suisse is a *société anonyme* incorporated and organized under the laws of Switzerland, and is located in Geneva, Switzerland.  (*Id.* ¶ 90).  Following a merger in 2000, BNP Paribas Suisse is a successor in interest to BNP Paribas Private Bank (Switzerland) S.A. and to United European Bank.  (*Id.*).

The Second Amended Complaint alleges that the Defendants were part of a global financial enterprise with a longstanding relationship with BLMIS, the BLMIS feeder funds, and Madoff himself.  (*Id.* ¶ 2).  In 1988, BNP Paribas SA provided Madoff with a $15 million line of credit, which increased to $75 million by October 1996.  (*Id.* ¶ 3).  The Second Amended Complaint alleges that this line of credit was received and repaid by BLMIS.  (*Id.*).  Over time, Defendants received over $1.4 billion in fraudulent transfers of customer property from various feeder funds.  (*Id.* ¶ 5).  The Trustee seeks here to recover over $111 million in customer property allegedly transferred to the Defendants from the Fairfield Funds and from the Rye Funds.  (*Id.* ¶ 6).

In their motion to dismiss, Defendants argue that this Court lacks personal jurisdiction over BGL BNP Paribas, BNP Paribas Securities Services Luxembourg, and BNP Paribas Suisse. (Mot. Dismiss, ECF No. 198).  Defendants further argue that claims for certain transfers are time-barred and, due to a prior decision of this Court, are foreclosed from relating back;  that the Trustee has failed to allege that Defendants received BLMIS customer property; that the initial transfers are not avoidable; and that the Defendants are entitled to the defenses of "good faith" and the "safe harbor" under § 546(e).  (*Id.* at 1-3).  The Trustee has filed opposition to the motion, and the Defendants have filed a reply.  (Opp'n, ECF No. 200); (Reply, ECF No. 202).

## DISCUSSION

**Personal Jurisdiction**

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Trustee "must make a prima facie showing that jurisdiction exists."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)).  A trial court has

considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). "'It may

determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the

motion; or it may conduct an evidentiary hearing on the merits of the motion.'" *Id.* (quoting

*Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *see also Picard v. BNP

Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018) (same). "Prior to

discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by

pleading in good faith, legally sufficient allegations of jurisdiction." 722 F.3d at 84–85 (quoting

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)); *Picard v.

Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 (Bankr. S.D.N.Y.

2021) (same).

    Defendants object to the assertion of personal jurisdiction over three entities: BGL BNP

Paribas, BNP Paribas Securities Services Luxembourg, and BNP Paribas Suisse (the "Personal

Jurisdiction Defendants"). (Mot. Dismiss at 17–18; ECF No. 198); (*see also id.* at 17 n.26)

("Although the BNPP Defendants continue to deny that any of the . . . Defendants are subject to

the personal jurisdiction of this Court . . . in light of this Court's prior decision, the motion does

not renew a request for dismissal with respect to BNPP Arbitrage, BNPP Cayman, and BNPP

Sec. Serv. on the basis that the Court lacks personal jurisdiction."). In the Second Amended

Complaint, the Trustee argues that Defendants purposely availed themselves of the laws of the

United States and New York. (Second Am. Compl. ¶ 91, ECF No. 191).

    The Trustee has alleged legally sufficient allegations of jurisdiction simply by stating that

the Defendants "knowingly directing funds to be invested with New York-based BLMIS through

the BLMIS Feeder Funds, including . . . the two Fairfield Funds, . . . and the three Tremont

Funds." (Second Am. Compl. ¶ 92, ECF No. 191).  This allegation alone is sufficient to

establish a prima facie showing of jurisdiction over Defendant in the pre-discovery stage of

litigation.  At the pre-discovery stage, the allegations need not be factually supported.  *See*

*Dorchester Fin. Sec.*, 722 F.3d at 85 (an averment of facts is necessary only after discovery).

That being stated, this was not the only allegation made by the Trustee.

      In order to be subjected to personal jurisdiction in the United States, due process requires

that a defendant have sufficient minimum contacts with the forum in which the defendant is sued

"'such that the maintenance of the suit does not offend traditional notions of fair play and

substantial justice.'"  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr.

S.D.N.Y. 2012) ("*BLI*") (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  The

pleadings and affidavits are to be construed "'in the light most favorable to the plaintiffs,

resolving all doubts in their favor.'"  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158,

163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008));

*Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018).

> The Supreme Court has set out three conditions for the exercise of specific
> jurisdiction over a nonresident defendant.  First, the defendant must have
> purposefully availed itself of the privilege of conducting activities within the forum
> State or have purposefully directed its conduct into the forum State.  Second, the
> plaintiff's claim must arise out of or relate to the defendant's forum conduct.
> Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up).

**Purposeful Availment**

      "[M]inimum contacts . . . exist where the defendant purposefully availed itself of the

privilege of doing business in the forum and could foresee being haled into court there." *Charles*

*Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018).  "Although a defendant's

contacts with the forum state may be intertwined with its transactions or interactions with the

plaintiff or other parties, a defendant's relationship with a third party, standing alone, is an insufficient basis for jurisdiction." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.* A party "purposefully avail[s] itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in the New York securities market." *BLI*, 480 B.R. at 517.

Each of the Personal Jurisdiction Defendants allegedly invested with Fairfield Sentry knowing that they would thereby invest with BLMIS in New York. The Second Amended Complaint makes the following specific allegations with respect to each of the three Personal Jurisdiction Defendants.

The Second Amended Complaint alleges that BNP Paribas Securities Services Luxembourg invested in the Fairfield Funds after it reviewed the private placement memoranda of those funds and executed subscription agreements. (Second Am. Compl. ¶¶ 128–29, ECF No. 191). The subscription agreements with Fairfield Sentry specified that subscriptions would be paid from and that redemption payments would be paid to an account at BNP Paribas NY. (*Id.* ¶ 130). BNP Paribas Securities Services Luxembourg "identified a New York-based affiliate . . . to receive all written communications from Fairfield Sentry related to [its] investment." (*Id.* ¶ 131). BNP Paribas Securities Services Luxembourg personnel allegedly "corresponded by email with New York-based FGG regarding investments in the Fairfield Funds." (*Id.* ¶ 132).

The Second Amended Complaint alleges that BGL BNP Paribas invested in the Fairfield Funds after it reviewed the private placement memoranda of those funds and executed

subscription agreements. (*Id.* ¶¶ 93–95). The subscription agreement with Fairfield Sentry specified that redemption payments from Fairfield Sentry would be paid to an account at BNP Paribas NY. (*Id.* ¶ 96).

The Second Amended Complaint alleges that BNP Paribas Suisse invested in Fairfield Sentry after it reviewed the fund's private placement memoranda and executed subscription agreements. (*Id.* ¶¶ 134–35). It is further alleged that "Fairfield Sentry was directed to send payments to BNP Paribas Suisse to an account at BNP Paribas NY." (*Id.* ¶ 136). BNP Paribas Suisse allegedly "marketed investment products that referenced BLMIS Feeder Funds, including the Kingate Funds and Fairfield Sentry." (*Id.* ¶ 137).

The Second Amended Complaint contains allegations that are sufficient to constitute a prima facie showing of jurisdiction. *Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d. Cir. 2013). "[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). "[Defendants] intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom." *BLI*, 480 B.R. at 506. Defendants' alleged contacts with New York are not random, isolated, or fortuitous.

## **Jurisdictional Discovery**

The Trustee argues in the alternative that he is entitled to Jurisdictional Discovery with respect to these defendants. (Opp'n at 15, ECF No. 200). Specifically, the Trustee argues that he has shown allegations that:

> Defendants subscribed to the Fairfield Funds for the purpose of investing in the
> U.S. securities markets, repeatedly used U.S. bank accounts to transact business

with the Fairfield Funds, and had significant business contacts in New York. At a
minimum, these allegations establish a 'threshold showing' of jurisdiction
sufficient to warrant jurisdictional discovery.

(*Id.*) (quoting *Blockchain Mining Supply & Servs. Ltd. v. Super Crypto Mining, Inc.*, 2020 WL

7128968, at *1 (S.D.N.Y. Dec. 4, 2020).

"Generally a plaintiff may be allowed limited discovery with respect to the jurisdictional

issue; but until she has shown a reasonable basis for assuming jurisdiction, she is not entitled to

any other discovery." *Filus v. Lot Polish Airlines*, 907 F.2d 1328,1333 (2d Cir. 1990) (holding

that if service of process was proper and the entities were the proper parties, the USSR must

answer interrogatories) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13

(1978)). In *Oppenheimer*, the Supreme Court notes: "where issues arise as to jurisdiction or

venue, discovery is available to ascertain the facts bearing on such issues." 437 U.S. at 351 n.13.

Even without a prima facie showing of jurisdiction, the Court has "'discretion to order

further discovery on the jurisdictional issue, provided that the plaintiff[ ] make[s] a threshold

showing of jurisdiction and establishes that [its] position is not frivolous.'" *Fairfield Sentry Ltd.

v. HSBC Sec. Servs. (Luxembourg) S.A.*, 2022 WL 3910679, at *8 (S.D.N.Y. Aug. 31, 2022)

(quoting *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 231

(S.D.N.Y. 2015)); *see also Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014) ("It is

well settled under Second Circuit law that, even where plaintiff has not made a prima facie

showing of personal jurisdiction, a court may still order discovery, in its discretion, when it

concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to

develop a full factual record.").

The Second Amended Complaint  provides a "reasonable basis for assuming jurisdiction"

over these three defendants.  (*See* Second Am. Compl. ¶¶ 93–137).  The Trustee alleges that the

Personal Jurisdiction Defendants have purposely availed themselves of the laws of the United States and New York by investing money with the Fairfield Funds while knowing and intending that those funds would be invested in New York-based BLMIS and by maintaining bank accounts in the United States. (*Id.* ¶¶ 91, 96, 130, 136). Jurisdictional discovery is not required.

**Arise out of or Relate to the Defendant's Forum Conduct**

As to the second prong, the suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, __ U.S. __, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, the court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Here, the Trustee is asserting subsequent transfer claims against the Personal Jurisdiction Defendants for monies they received from the BLMIS feeder funds, as a result of their investments with the funds and their alleged operations with New York-based FGG. (Second Am. Compl. ¶¶ 93–96, 127–37). These allegations are directly related to their investment activities with the Fairfield Funds. *BNP Paribas S.A.* 594 B.R. at 191 (finding that the redemption and other payments the defendants received as direct investors in a BLMIS feeder fund arose from the New York contacts such as sending subscription agreements to New York,

wiring funds in U.S. dollars to New York, sending redemption requests to New York, and

receiving redemption payments from a Bank of New York account in New York, and were the

proximate cause of the injuries that the Trustee sought to redress).  The suit is affiliated with the

alleged in-state conduct.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919

(2011).

**Reasonableness**

Following a determination on minimum contacts, the Court must determine if exercising

personal jurisdiction over the Personal Jurisdiction Defendants is reasonable and "comport[s]

with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476

(1985) (internal quotations omitted).  Factors the Court may consider include the burden on the

defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in

obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the

most efficient resolution of controversies, and the shared interest of the several States in

furthering fundamental substantive social policies.  *Id.* at 477.

The exercise of jurisdiction is reasonable.  The Personal Jurisdiction Defendants are not

burdened by this litigation.  They have actively participated in this Court's litigation for over ten

years, are represented by U.S. counsel, allegedly held bank accounts in New York, and submitted

to the jurisdiction of New York courts when they signed subscription agreements for shares in

Fairfield Sentry.[3]  (Second Am. Compl. ¶¶ 93–96, 127–37).   The forum and the Trustee both

---

[3]  Even though this Court held that a defendant's consent to jurisdiction in New York courts
contained in the subscription agreements it signed prior to investing with Fairfield Sentry could
not be used as the sole basis for this Court's exercise of personal jurisdiction over an action by
foreign liquidators to recover redemption payments under British Virgin Island law, the fact that
Defendants agreed to submit to the jurisdiction of this Court is certainly a relevant factor in
determining whether the exercise of jurisdiction over Defendants is reasonable.  *In re Fairfield
Sentry v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), Case No. 10-13164 (SMB),

have a strong interest in litigating BLMIS adversary proceedings in this Court. *Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012); *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010); *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009); *Picard v. Fairfield Greenwich Grp., (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 568 (Bankr. S.D.N.Y. 2021); *see also In re Picard*, 917 F.3d 85, 103 (2d Cir. 2019) ("The United States has a compelling interest in allowing domestic estates to recover fraudulently transferred property.").

By alleging that Defendants intentionally invested in BLMIS, the Trustee has met his burden of alleging jurisdiction as to each subsequent transfer that originated with BLMIS. And by alleging that Defendants used New York bank accounts, the Trustee has met his burden of alleging jurisdiction over each transfer that received through a New York bank account.

As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019). The Trustee has made a prima facie showing of personal jurisdiction with respect to all of the subsequent transfers at issue in this Complaint.

**12(b)(6) standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The claim is facially plausible when a plaintiff pleads facts that

---

Adv. No. 10-03496 (SMB), 2018 WL 3756343, at *12 (Bankr. S.D.N.Y. Aug. 6, 2018) ("Defendants' consent to the Subscription Agreement does not constitute consent to personal jurisdiction in the U.S. Redeemer Actions."), *aff'd, Fairfield Sentry Ltd. v. Citibank, N.A. London*, No. 19-CV-3911 (VSB), 2022 WL 3644436, at *9 (S.D.N.Y. Aug. 24, 2022).

allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In deciding a motion to dismiss, the Court should assume the factual allegations are true and determine whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is "deemed to include any written instrument attached to it as an exhibit[,] . . . documents incorporated in it by reference[,]" and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted). A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153). The Trustee is seeking to recover subsequent transfers made to Defendant by the Fairfield Funds and the Tremont Funds.

**Recovery of Subsequent Transfers**

Pursuant to § 550(a) of the Bankruptcy Code, a trustee is entitled to recover avoided transfers of customer property from initial transferees as well as from "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). "To plead a subsequent transfer claim, the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, that the funds at issue originated with the debtor." *Picard v. BNP Paribas S.A. (In re BLMIS),* 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018); *see also SIPC v. BLMIS (In re Consol. Proc. On 11 U.S.C. § 546(e))*, No. 12 MC 115, 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013). "Federal Civil Rule 9(b) governs the portion of a claim to avoid an initial intentional fraudulent transfer and Rule 8(a) governs the portion of a claim to recover the subsequent transfer." *BNP Paribas*, 594 B.R. at 195 (*citing Sharp Int'l Corp. v. State St. Bank & Trust Co., (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005).

The Trustee only needs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff's burden at the pleading stage does not require exact accounting of the funds at issue. *BNP Paribas*, 594 B.R. at 195. Rather "[t]he plaintiff must allege the necessary vital statistics – the who, when, and how much – of the purported transfers to establish an entity as a subsequent transferee of the funds." *Id.* However, the plaintiff's burden at the pleading stage does not require dollar-for-dollar accounting of the exact funds at issue." *Id*.

While the Trustee must allege that the initial transfer from BLMIS to the initial transferees, such as Fairfield Sentry and the Tremont Funds, is avoidable, he is not required to avoid the transfer received by the initial transferee before asserting an action against subsequent transferees. *IBT Int'l Inc. v. Northern (In re Int'l Admin Servs., Inc.)*, 408 F.3d 689, 706-07

(11th Cir. 2005).  The Trustee is free to pursue any of the immediate or mediate transferees, and nothing in the statute requires a different result.  *IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706-07 (11th Cir. 2005).

The Trustee pleaded the avoidability of the initial transfers from BLMIS to Fairfield Sentry by adopting by reference the entirety of the complaint filed against Fairfield Sentry in adversary proceeding 09-01239 (the "Fairfield Complaint").  (Second Am. Compl. ¶ 139, ECF No. 191).  The Trustee pleaded the avoidability of the initial transfers from BLMIS to the Tremont funds by adopting by reference the entirety of the complaint filed against them in adversary proceeding 10-05310 (the "Tremont Complaint").  (*Id.* ¶ 141).

Whether the Fairfield and Tremont Complaints properly plead the avoidability of the initial transfers, is governed by Rule 9(b).  Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

> Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee, applicable Second Circuit precedent instructs courts to adopt a more liberal view since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge. Moreover, in a case such as this one, where the Trustee's lack of personal knowledge is compounded with complicated issues and transactions that extend over lengthy periods of time, the trustee's handicap increases, and even greater latitude should be afforded.

*Picard v. Cohmad Secs. Corp.,* (*In re BLMIS*), 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (cleaned up).

**Adoption by Reference**

The Trustee has adopted by reference allegations contained in his complaint against Fairfield Sentry and the Tremont Funds.  (Am. Compl. ¶ 119, ECF No. 193).  "Adoption by

reference is governed by Rule 10 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 10(c).

Rule 10(c) states: "A statement in a pleading may be adopted by reference elsewhere in the same

pleading or in any other pleading or motion." The district court has already found that adoption

by reference of the entire Fairfield Complaint is proper. *See SIPC v. BLMIS* (*In re Consolidated*

*Proceedings on 11 U.S.C. § 550(a)*), 501 B.R. 26, 36 (S.D.N.Y. 2013) ("The Trustee's complaint

against Standard Chartered Financial Services incorporates by reference the complaints against

Kingate and Fairfield, including the allegations concerning the avoidability of the initial

transfers, and further alleges the avoidability of these transfers outright. Thus, the avoidability of

the transfers from Madoff Securities to Kingate and Fairfield is sufficiently pleaded for purposes

of section 550(a).") (cleaned up).

      The Court will follow the district court's instruction. As was explained in *In re Geiger,*

pleadings filed in the "same action" may be properly adopted by reference in other pleadings in

that action. 446 B.R. 670, 679 (Bankr. E.D. Pa. 2010). The Fairfield Complaint was filed in the

"same action" as this adversary proceeding for purposes of Rule 10(c). *Id.* Cases within this

SIPA proceeding are filed in the same "proceeding"—the SIPA proceeding. *In re Terrestar*

*Corp.*, No. 16 CIV. 1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) ("Adversary

proceedings filed in the same bankruptcy case do not constitute different cases."); *see also Sec.*

*Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197, 237 (Bankr. S.D.N.Y. 2019)

("The prior decisions within this SIPA proceeding constitute law of the case . . . . "); *Sec. Inv.*

*Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019),

(citing *In re Motors Liquidation Co*., 590 B.R. 39, 62 (S.D.N.Y. 2018) (law of the case doctrine

applies across adversary proceedings within the same main case), *aff'd*, 943 F.3d 125 (2d Cir.

2019)); *Perez v. Terrastar Corp. (In re Terrastar Corp.)*, No. 16 Civ. 1421 (ER), 2017 WL

1040448, at *4 (S.D.N.Y. Mar. 16, 2017) ("Adversary proceedings filed in the same bankruptcy

case do not constitute different cases."), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017);

*Bourdeau Bros., Inc. v. Montagne (In re Montagne)*, No. 08-1024 (CAB), 2010 WL 271347, at

*6 (Bankr. D. Vt. Jan. 22, 2010) ("[D]ifferent adversary proceedings in the same main case do

not constitute different 'cases.'").

Through the adoption of the Fairfield Complaint and the Tremont Complaint, the Trustee

has adequately pleaded, with particularity, the avoidability of the initial due to Fairfield Sentry's

and the Tremont Funds' knowledge of BLMIS's fraud.  (Fairfield Compl. ¶¶ 314–18, 09-01239,

ECF No. 286); (Tremont Complaint ¶¶ 146–59, 10-05310 ECF No. 1);  *see also SIPC v. BLMIS*

(*In re Consolidated Proceedings on 11 U.S.C. § 550(a)*), 501 B.R. 26, 36 (S.D.N.Y. 2013)

("[T]he Court directs that the following adversary proceedings be returned to the Bankruptcy

Court for further proceedings consistent with this Opinion and Order . . . .").

**Whether BLMIS's Initial Transfers Are Avoidable as Intentionally Fraudulent
Conveyances?**

In relevant part, § 548(a)(1)(A) allows the Trustee to avoid any transfer made within two

years before the filing date of this SIPA action, if BLMIS made the transfer with "actual intent to

hinder, delay, or defraud."  11 U.S.C. § 548(a)(1)(A).  Defendants argue that the transfers are not

avoidable under § 548(a)(1)(A) because the Trustee has failed to plead BLMIS's actual

fraudulent intent with respect to each transfer and that the Ponzi scheme presumption cannot be

used to plead BLMIS's actual fraudulent intent.  (Mem. L. at 27, ECF No. 198).

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

> Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee,
> applicable Second Circuit precedent instructs courts to adopt a more liberal view
> since a trustee is an outsider to the transaction who must plead fraud from second-
> hand knowledge. Moreover, in a case such as this one, where the Trustee's lack of
> personal knowledge is compounded with complicated issues and transactions that
> extend over lengthy periods of time, the trustee's handicap increases, and even
> greater latitude should be afforded.

*Picard v. Cohmad Secs. Corp.,* (*In re BLMIS*), 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011)

(cleaned up).

Because the Trustee has pleaded that BLMIS operated a Ponzi scheme, the Trustee's

burden of pleading actual fraudulent intent is satisfied. (Second Am. Compl. ¶¶ 29); (*id.* ¶ 32)

(Madoff pleaded guilty and admitted he operated a Ponzi scheme through BLMIS). The "Ponzi

scheme presumption" allows courts to presume actual intent to defraud on part of the operator of

the Ponzi scheme. *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of

a Ponzi scheme is sufficient to establish actual intent to defraud."). In this case, the Ponzi

scheme presumption allows the Court to presume that BLMIS made the initial transfers with

actual intent to defraud because Madoff has admitted to operating a Ponzi scheme.

The mere existence of a Ponzi scheme "demonstrates actual intent as matter of law

because transfers made in the course of a Ponzi scheme could have been made for no purpose

other than to hinder, delay or defraud creditors." *Bear Stearns Secs. Corp. v. Gredd* (*In re

Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 8 (S.D.N.Y. 2007). The "Ponzi scheme presumption"

makes perfect sense in cases such as this one. BLMIS had no legitimate assets and therefore

every transfer made by BLMIS was made with actual intent to defraud in order to ensure that

Ponzi scheme would survive.

The Trustee has pleaded that BLMIS operated a Ponzi scheme and as such, BLMIS's

actual fraudulent intent is presumed via the Ponzi scheme presumption. (Second Am. Compl. ¶¶

29–53).  Intent to defraud is established as debtor operated a Ponzi scheme. *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) (citing *Omnibus Good Faith Decision*, 531 B.R. at 471) ("the Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent"); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("the fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption'").  That BLMIS operated as a Ponzi scheme is well-established and the Court relies on earlier findings of same and holds that the Trustee has met its burden of pleading BLMIS's actual intent on this issue.  *See Picard v. Legacy Capital Ltd.*, 603 B.R. 682, 688-93 (Bankr. S.D.N.Y. 2019) (discussing in detail that BLMIS was a Ponzi scheme and why the Trustee is permitted to rely on the Ponzi scheme presumption to prove intent as a matter of law); *see also Bear Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit.").

The Ponzi scheme presumption saves the Trustee and the courts time and resources by presuming that each transfer was made with actual fraudulent intent.  Without the presumption, Defendants would not be "off-the-hook" for the two-year transfers because the Trustee would meet (and, in this case, has met) his pleading burden by pleading the "badges of fraud" with respect to BLMIS.

> Badges of fraud include (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry.

*See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983). The "concealment

of facts and false pretenses by the transferor" is also a circumstance from which courts have

inferred intent to defraud. *Id.* at 1582 (quoting 4 *Collier on Bankruptcy* ¶ 548.02[5] at 548–34 to

38 (L. King 15th ed. 1983)). The existence of several badges can "constitute conclusive evidence

of an actual intent to defraud." *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent*

*Conveyance Litig.)*, No. 11-md-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017)

(citation omitted); *Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019).

   BLMIS's actual fraudulent intent is well-pleaded in the Second Amended Complaint.

(Second Am. Compl. ¶¶ 11–20; 29–53). The Court need not infer intent to defraud because

Madoff has admitted that he had actual intent to defraud when he admitted under oath that he

operated a Ponzi scheme. (*Id.* ¶ 53). The Trustee has alleged that "BLMIS's website omitted the

I[nvestment] A[dvisory] Business entirely. BLMIS did not register as an investment adviser

with the SEC until 2006, following an investigation by the SEC, which forced Madoff to

register." (*Id.* ¶ 26). "For more than 20 years preceding that registration, the financial reports

BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer

funds BLMIS managed through its I[nvestment] A[dvisory] Business. (*Id.* ¶ 27). BLMIS lied to

the SEC in reports regarding the number of accounts it has and "grossly understated" the amount

of assets under management. (*Id.* ¶ 28). BLMIS had no legitimate business operations and

produced no profits or earnings. (*Id.* ¶ 29) "Madoff was assisted by several family members and

a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno,

JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying

out the fraud." (*Id.*). BLMIS used its fraudulent investment advisory business to prop up its

proprietary trading business, which also incurred significant losses. (*Id.* ¶ 34). "BLMIS reported

falsified trades using backdated trade data on monthly account statements sent to BLMIS

customers that typically reflected impossibly consistent gains on the customers' principal

investments." (*Id.* ¶ 37).  "There are no records to substantiate Madoff's sale of call options or

purchase of put options in any amount, much less in billions of notional dollars."  (*Id.* ¶ 42).

"Madoff could not be using the SSC Strategy because his returns drastically outperformed the

market [and] such results were impossible if BLMIS had actually been implementing the SSC

Strategy."  (*Id.* ¶ 44).  "There is no record of BLMIS clearing a single purchase or sale of

securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation,

the clearing house for such transactions, its predecessors, or any other trading platform on which

BLMIS could have traded securities."  (*Id.* ¶ 50).

Though unnecessary, the Trustee has successfully pleaded badges 2, 3, 4, 5, and 6.  The

Trustee need not plead all six badges of fraud to meet his burden of pleading actual fraudulent

intent.  *In re May*, 12 B.R. 618, 627 (N.D. Fla. 1980) ("Such indicators or badges, when

established either singularly, but more often in combination, may justify the inference of the

requisite intent to hinder, delay or defraud creditors.").

**The Safe Harbor Does Not Bar the Avoidance of the Fairfield Initial Transfers**

Defendants have raised the "safe harbor" defense, found in § 546(e), to the Trustee's

allegations.  Section 546(e) is referred to as the safe harbor because it protects a transfer that is a

"settlement payment ... made by or to (or for the benefit of) a ... financial institution [or]

financial participant," or that is "made by or to (or for the benefit of) a ... financial institution [or]

financial participant ... in connection with a securities contract."  11 U.S.C. § 546(e).  "By its

terms, the safe harbor is a defense to the avoidance of the *initial* transfer."  *Picard v. BNP*

*Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

Where the initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of

certain transfers, as is the case here, the subsequent transferee is entitled to raise a § 546(e)

defense against recovery of the initial transfer.  *Picard v. Fairfield Inv. Fund* (*In re BLMIS*), No.

08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug.

6, 2021).  On the issue of the safe harbor, the Court adopts the district court's reasoning in:

*Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767

(S.D.N.Y. Nov. 3, 2022).

The Trustee has alleged that the Fairfield and the Tremont Funds knew the payments they

received from BLMIS were neither settlement payments nor payments in connection with a

securities contract.  (Second Am. Compl. ¶¶ 138–41, ECF No. 191).  "The safe harbor was

intended, among other things, to promote the reasonable expectations of legitimate investors.  If

an investor knew that BLMIS was not actually trading securities, he had no reasonable

expectation that he was signing a contract with BLMIS for the purpose of trading securities for

his account.  In that event, the Trustee can avoid and recover preferences and actual and

constructive fraudulent transfers to the full extent permitted under state and federal law."  *Picard*

*v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016) (internal citations

omitted), *vacated and remanded on other grounds, Picard v. Citibank, N.A.* (*In re BLMIS*), 12

F.4th 171 (2d Cir. 2021)).

The district court determined that "those defendants who claim the protections of Section

546(e) through a Madoff Securities account agreement but who actually knew that Madoff

Securities was a Ponzi scheme are not entitled to the protections of the Section 546(e) safe

harbor, and their motions to dismiss the Trustee's claims on this ground must be denied."  *SIPC*

*v. BLMIS (In re Consolidated Proceedings on 11 U.S.C. § 546(e))*, No. 12 MC 115(JSR), 2013

WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013); *see also Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022) ("[I]n circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) d[oes] not apply as a matter of its express terms.").

This Court is powerless to reconsider this issue, agrees with the district court's reasoning, and finds its holding consistent with *dicta* set forth by the Court of Appeals for the Second Circuit. *See Picard v. Ida Fishman Revocable Trust* (*In re Bernard L. Madoff Inv. Sec. LLC*), 773 F.3d 411, 420 (2d Cir. 2014) ("The clawback defendants, having every reason to believe that BLMIS was actually engaged in the business of effecting securities transactions, have every right to avail themselves of all the protections afforded to the clients of stockbrokers, including the protection offered by § 546(e).").

## Knowledge of the Fairfield Funds

This Court has already determined that the Fairfield Complaint contains sufficient allegations of Fairfield Sentry's actual knowledge to defeat the safe harbor defense on a Rule 12(b)(6) motion. *See Picard v. Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021) ("[T]he Trustee has alleged that the agents and principals of the Fairfield Funds had actual knowledge of Madoff's fraud"). In that adversary proceeding, the Court held that "[t]he Trustee has pled [actual] knowledge in two ways: 1) that certain individuals had actual knowledge of Madoff's fraud, which is imputed to the Fairfield Funds; and 2) that actual knowledge is imputed to the Fairfield Funds through 'FGG,' an alleged 'de facto' partnership." *Id.* at *4; *see also* Fairfield Compl. ¶ 320 ("Fairfield Sentry had actual knowledge of the fraud at BLMIS"); Fairfield Compl. ¶ 321 ("Greenwich Sentry and Greenwich Sentry Partners had actual knowledge of the fraud at

BLMIS"); Fairfield Compl. ¶ 322 ("FIFL had actual knowledge of the fraud at BLMIS");

Fairfield Compl. ¶ 323 ("Stable Fund had actual knowledge of the fraud at BLMIS"); Fairfield

Compl. ¶ 324 ("FG Limited had actual knowledge of the fraud at BLMIS"); Fairfield Compl. ¶

325 ("FG Bermuda had actual knowledge of the fraud at BLMIS"); ¶ 326 ("FG Advisors had

actual knowledge of the fraud at BLMIS"); Fairfield Compl. ¶ 327 ("Fairfield International

Managers had actual knowledge of the fraud at BLMIS"); Fairfield Compl. ¶ 328 ("FG Capital

had actual knowledge of the fraud at BLMIS"); Fairfield Compl. ¶ 329 ("Share Management had

actual knowledge of the fraud at BLMIS"); Fairfield Compl. ¶ 9 ("It is inescapable that FGG

partners knew BLMIS was not trading securities. They knew BLMIS's returns could not be the

result of the split strike conversion strategy (the "SSC Strategy"). They knew BLMIS's equities

and options trading volumes were impossible. They knew that BLMIS reported impossible, out-

of-range trades, which almost always were in Madoff's favor. They knew Madoff's auditor was

not certified and lacked the ability to audit BLMIS. They knew BLMIS did not use an

independent broker or custodian. They knew Madoff refused to identify any of BLMIS's options

counterparties. They knew their clients and potential clients raised numerous due diligence

questions they would not and could not satisfactorily answer. They knew Madoff would refuse to

provide them with honest answers to due diligence questions because it would confirm the

details of his fraud.  They knew Madoff lied about whether he traded options over the counter or

through the exchange. They knew they lied to clients about BLMIS's practices in order to keep

the money flowing and their fees growing. And they knowingly misled the SEC at Madoff's

direction.").

     "In sum, if the Trustee sufficiently alleges that the [initial] transferee from whom he

seeks to recover a fraudulent transfer knew of [BLMIS ]'[s] fraud, that transferee cannot claim

the protections of Section 546(e)'s safe harbor." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021).

This Court determined that the Fairfield Complaint is replete with allegations demonstrating that Fairfield Sentry had actual knowledge that BLMIS was not trading securities. *See Picard v. Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789(CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479, at *3–*7 (Bankr. S.D.N.Y. Aug. 6, 2021). Where § 546(e) does not "embrace the initial transfer, the subjective knowledge of a subsequent transferee cannot retroactively render it applicable." *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022). The Trustee's allegations in the Fairfield Complaint are sufficient to survive a Rule 12(b)(6) motion on this issue.

<u>Knowledge of the Tremont Funds</u>

The Second Amended Complaint alleges that the Tremont Funds received the initial transfers with "actual knowledge of fraud at BLMIS, or, at minimum, while aware of suspicious facts that would have led Tremont to inquire further into the BLMIS fraud." (Second Am. Compl. ¶¶ 249, 254, 262 ECF No. 191).

The Tremont Complaint, which is adopted by reference into the Complaint, alleges that the Tremont Group was repeatedly advised of BLMIS trading impossibilities and other indicia of fraud. (Tremont Compl., Adv. Pro. 10-05310, ¶ 158, ECF No. 1) (2003 email alerting Tremont management to BLMIS practices consistent with fraud); (*id.* ¶ 194) (Internal Tremont email scoffing at potential investor "concerned about Tremont's relationship with Madoff, saying that there was no transparency there and that it was prone to a blow-up that would destabilize Tremont. . . ."); (*id.* ¶ 194) (Tremont more concerned with "feeding 'a lot of money' to Madoff, as opposed to actually understanding what Madoff was doing with that money"); (*id.* ¶ 197)

(client unable to reconcile different results from investments with BLMIS directly versus through a Rye fund); (*id.* ¶ 215) (internal Tremont emails questioned use of auditor to investigate BLMIS). Tremont officers failed to confirm or question information given to it by Madoff regarding the counterparty to trades and "at times also falsely led others to believe they knew the counterparties." (*Id.* ¶ 190). "The Rye Funds received trade confirmations from BLMIS reflecting securities transactions that could not have occurred, because they took place outside of the range of stock and options prices for such securities traded in the market on the days in question." (*Id.* ¶ 181). Tremont failed to question over 600 instances of this out-of-range information. (*Id.* ¶¶ 181–83). Tremont was "consciously chose to do nothing in response" to highly irregular and suspicious requirements set by Madoff. (*Id.* ¶ 211).

The Second Amended Complaint alleges that Sandra Manzke, Tremont's founder and former CEO, had regular meetings and calls with Madoff and Frank DiPascali. (Second Am. Compl. ¶ 142, ECF No. 191). Robert Schulman, as co-CEO and then sole CEO of Tremont, touted his "special relationship" with Bernard Madoff. (*Id.* ¶ 143). Others described this relationship in similar terms. In 2003, Tremont told its auditor, Ernst & Young, that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year . . ." and in June 2006, a Tremont vice president informed a potential investor that Schulman was "'intimately familiar' with Madoff based on 'a 10+ year relationship.'" (*Id.*). An investor in two Tremont feeder funds wrote to Schulman to 2001, "I know you are sick of answering this but man is it hot out there with the Bernie [Madoff] fraud rumors." (*Id.* ¶ 145). In 2007, a potential client met with officers of Tremont and discussed whether BLMIS's business was fraudulent and perhaps a Ponzi scheme. (*Id.* ¶ 152–53). When the potential clients followed up by email with questions about

BLMIS, a Tremont officer responded internally that they should "give answers by phone rather than email . . . ." (*Id.* ¶ 154).

Tremont continued to receive warnings from potential investors who were concerned about whether Madoff's strategy involved "trades actually tak[ing] place." (*Id.* ¶ 157). Tremont's own reports showed that BLMIS's reported trades were impossible. (*Id.* ¶ 158). Tremont's estimates showed that there was "insufficient volume for dozens, if not hundreds of the trades Madoff purported to complete." (*Id.* ¶ 159). Tremont chose to shield BLMIS from inquiries, "with fabrications of its own, which changed depending on who was asking." (*Id.* ¶ 191). All of this was overlooked because Tremont, admittedly, made millions for doing little besides allowing investors access to BLMIS. (*Id.* ¶¶ 201–05).

The Trustee has sufficiently plead the actual knowledge of the Tremont Funds that BLMIS was not trading securities, which makes the safe harbor inapplicable by its express terms. *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

Whether the safe harbor applies to the initial transfers under the theory that BLMIS's transfers to the Fairfield and Tremont Funds were made in connection with the feeder funds' contracts with Defendants (rather than a contract with BLMIS) is not answerable on the pleadings. If such a fact-specific determination is needed, the Court will make it with the benefit of a "full factual record." *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *9 (S.D.N.Y. Nov. 3, 2022).

**The Safe Harbor Cannot be Used to Defeat a Subsequent Transfer**

The safe harbor cannot be used to prevent the Trustee from avoiding the subsequent

transfer between the feeder funds and Defendants on account of the securities contracts between

them.  The safe harbor is not applicable to subsequent transfers.  "By its terms, the safe harbor is

a defense to the avoidance of the *initial* transfer."  *Picard v. BNP Paribas S.A. (In re BLMIS)*,

594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original); *see also* 11 U.S.C. § 546(e)

(failing to include § 550 in its protections).  Since there must be an initial transfer in order for the

Trustee to collect against a subsequent transferee, a subsequent transferee may raise the safe

harbor as a defense—but only in so far as the avoidance of the initial transfer is concerned.  The

safe harbor cannot be used as a defense by the subsequent transferee because the Trustee is not

"avoiding" a subsequent transfer, "he recovers the value of the avoided initial transfer from the

subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the

recovery claims under section 550."  *BNP Paribas S.A.* 594 B.R. at 197.

**BLMIS Customer Property**

Defendants argue that the Second Amended Complaint fails to plead receipt of BLMIS

customer property.  (Mem. L. at 21–24, ECF No. 198).  The Trustee has pleaded that the specific

amounts which the feeder funds transferred to the Defendants prior to the filing date.  (Second

Am. Compl. 220–74); (*see also id.* Exs. C–W).  The exhibits to the Complaint provide Defendant

with the exact date and amount of each transfer the Trustee is seeking to recover.  These exhibits

provide Defendant with the "who, when, and how much" of each transfer.  *BNP Paribas S.A.*,

594 B.R.at 195.

Defendants argue that the allegations fail as the Fairfield liquidators, in a separate

adversary proceeding, admitted that they comingled funds and paid certain redemptions though

cash-on-hand and not from BLMIS funds.  (Mem. L. at 23). As the Trustee notes, this allegation

does not appear in the Second Amended Complaint and was not even made by the Trustee; it

was made by the liquidators of the Fairfield Funds.  The Court will not read these allegations into

the Second Amended Complaint.

To consider allegations made in dozens of other complaints filed by the Trustee and by

other parties in this SIPA proceeding and in other proceedings is impractical and not required at

this stage of the litigation.  The other complaints have not been adopted by reference by the

Trustee in this adversary proceeding and, as such, are not within the Court's power to consider on

a Rule 12(b)(6) motion.  *Williams v. Time Warner Inc.*, 440 Fed. App'x 7, 9 (2d Cir. 2011) ("A

district court, in deciding whether to dismiss a complaint under Rule 12(b)(6), is generally

limited to the facts as presented within the four corners of the complaint, to documents attached

to the complaint, or to documents incorporated within the complaint by reference.") (citing

*Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002)).

In order to determine how Fairfield Sentry spent the billions of dollars it received from

BLMIS, this Court would need review financial documents in order to trace the monies to all of

Fairfield Sentry's principals, insiders, creditors, and customers.  Undoubtedly, the Court will

trace and calculate how Fairfield Sentry spent its BLMIS (and any non-BLMIS) funds at a later

stage of litigation.  At this stage, the Trustee need only assert allegations that make it plausible

that Defendants received BLMIS monies.

The Court finds that the Trustee has plausibly alleged Defendants received BLMIS

customer property.  The Complaint states that the Fairfield and Tremont Funds did not have any

assets that were not BLMIS customer property.  The Fairfield Complaint, which is incorporated

by reference into this Complaint, alleges that the Fairfield Fund was required to invest 95% of its

assets in BLMIS.  (Fairfield Compl. ¶ 89); *see also* (Fairfield Compl. ¶ 91) ("From the

beginning, to comport with Madoff's requirement for BLMIS feeder funds, Fairfield Sentry

ceded control of not only its investment decisions, but also the custody of its assets, to

BLMIS.").  The Second Amended Complaint alleges that the Tremont Funds "invested all or

substantially all of [their] funds indirectly in BLMIS."  (*Id.* ¶¶ 71–73).  Taking all allegations as

true and reading them in a light most favorable to the Trustee, the Complaint plausibly pleads

that Defendants received customer property because the feeder funds did not have other property

to give.

**Whether Defendants Took the Transfers for Value, in Good Faith, and Without
Knowledge of the Voidability of the Initial Transfers?**

Defendants have raised the "good faith defense" under § 550(b), arguing that this Court

should dismiss the Trustee's complaint because it took "for value," "in good faith," and "without

knowledge of the voidability of the transfers."  (Mem. L. at 24, ECF No. 198).

"An affirmative defense may be raised by a pre-answer motion to dismiss under Rule

12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of

the complaint."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).  "Not

only must the facts supporting the defense appear on the face of the complaint, but, as with all

Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief."

*McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (cleaned up).  A "plaintiff is entitled to all

reasonable inferences from the facts alleged, not only those that support his claim, but also those

that defeat the [affirmative] defense." *Id.*

       *i.*    *For Value*

The "value" that a subsequent transferee must provide is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13, 37 (Bankr. S.D.N.Y. 2016) (citation omitted); *accord Enron Corp. v. Ave. Special Situations Fund II, L.P.* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005). In addition, the "value" element under § 550(b)(1) looks to what the transferee gave up rather than what the transferor received.

Defendants argue that the redemptions were received in connection with the subscription agreements between the Defendants and the Fairfield and Tremont Funds. (Mem. L. at 24, ECF No. 198). If Defendants knew at the time they redeemed their shares that the shares were worthless, then they did not receive the subsequent transfer funds "for value" as is required under § 550. *See Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 301 (Bankr. S.D.N.Y. 2018), *aff'd sub nom. Fairfield Sentry Ltd. v. Citibank, N.A. London*, No. 19-CV-3911 (VSB), 2022 WL 4391023 (S.D.N.Y. Sept. 22, 2022) ("The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust."). It has not yet been determined whether Defendants knew if the shares they redeemed from the Fairfield and Tremont Funds had value.

"Value" is Defendant's burden to plead and prove. *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018). Whether the Defendant gave value is a question of fact to be resolved either at the summary judgment stage or at trial. *Picard v.*

*Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL
3477479, at *9 (Bankr. S.D.N.Y. Aug. 6, 2021).

  *ii.*  *Good Faith*

  Where, in light of surrounding circumstances, a transferee should have known of the
debtor's precarious financial condition, the transferee will be deemed to have taken in bad faith,
unless an investigation into the debtor's financial condition actually discloses no reason to
suspect financial trouble.  2 Bankruptcy Desk Guide § 19:105.  The District Court has explained
that good faith is a fact-intensive inquiry that almost always requires a trial: "The Second Circuit
made clear in its decision in [*Picard v.*] *Citibank*[*, N.A. (In re BLMIS)*, 12 F.4th 171 (2d Cir.
2021), *cert. denied* No. 21-1059 (Feb. 28, 2022)] that the inquiry notice standard requires a 'fact-
intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the
disparate circumstances of differently-situated transferees.'"  *In re BLMIS, LLC*, Dec. & Order,
20-cv-02586(CM) (May 2, 2022).  And that "such a fact-based determination can only be made
based on the entirety of the factual record after discovery . . . ."  *Id.* (internal quotation omitted).

  The burden of proving good faith falls squarely on Defendants, and this Court cannot
make a determination on Defendant's affirmative defense until after a fact-intensive inquiry.
Discovery is required on this issue.

  *iii.*  *Knowledge of the Voidability*

  Good faith is linked with whether one had knowledge of the voidability of the transfer.
*Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 189 (2d Cir. 2021) ("[A] transferee does
not act in good faith when he has sufficient actual knowledge to place him on inquiry notice of
the debtor's possible insolvency."), *cert. denied sub nom. Citibank, N.A. v. Picard*, 212 L. Ed. 2d
217, 142 S. Ct. 1209 (2022).  Having determined that "good faith" cannot be found on the face of

a complaint, the Court must deny the Defendants' motion on this element. Additionally, § 550(b)(1) provides a defense to recovery making lack of knowledge Defendants burden to plead and prove. It is a fact-intensive inquiry that requires a three-step inquiry into 1) what Defendants subjectively knew; "whether these facts put [Defendants] on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the [Defendants'] position to conduct further inquiry into a debtor-transferor's possible fraud; and whether "diligent inquiry by [Defendants] would have discovered the fraudulent purpose of the transfer." *Id.* at 192. It is not appropriate for the Court to resolve these factual issues at this stage of the litigation.

**Whether Claims are Time Barred or Fail to Relate Back**

The Second Amended Complaint seeks to recover approximately $111 million in subsequent transfers made to the Defendants. This amount includes over $88 million of transfers that were not sought in the original or the first amended complaint. The Original Complaint failed to allege any transaction between certain entities which total nearly $82.2 million. The Defendants argue that the new transfers are time barred. (Mem. L. at 12, ECF No. 198); (Reply at 2-3, ECF No. 202).

Under § 550(f), an action to recover subsequent transfers must be commenced no later than one year after the avoidance of the transfer or the date on which the case is closed or dismissed. 11 U.S.C. § 550(f). A settlement presents finality which "triggers the relevant one-year statute of limitations under section 550(f) of the Code." *SIPC v. BLMIS (In re BLMIS)*, 501 B.R. 26, 32 (S.D.N.Y. 2013) (quoting *BLI*, 480 B.R. 501, 522 (Bankr. S.D.N.Y.2012). This Court approved settlements between the Trustee and the Fairfield and Tremont funds in 2011, under which the initial transfers from BLMIS were avoided. (Second Am. Compl. ¶¶ 215, 244).

The Trustee filed this Second Amended Complaint in March 2023, several years past the §550

statute of limitations.  (*See* Compl., ECF No. 1).  The new claims are outside of the relevant

statute of limitations.

An amendment to the complaint that is "filed after the applicable statute of limitations

has run asserting additional claims that do not relate back to the date of an earlier timely pleading

is futile."  *SIPC v. BLMIS (In re BLMIS)*, 594 B.R. 167, 207 (Bankr. S.D.N.Y. 2018) (citing

*Rodriguez v. City of N. Y.*, 10–CIV–1849, 2011 WL 4344057, at *6 (S.D.N.Y. Sept. 7, 2011)).

Under Rule 15, "[a]n amendment to a pleading relates back to the date of the original pleading

when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or

occurrence set out—or attempted to be set out—in the original pleading[.]"  Fed. R. Civ. P.

15(c)(1)(B).  Rule 15 "does not set a high bar for relation back, so long as the claims attempted

to be asserted in the new complaint share a reasonable measure of common ground with the

allegations in the original pleading."  *Picard v. Peter Madoff (In re BLMIS)*, 468 B.R. 620, 633

(Bankr. S.D.N.Y. 2012) ("*Peter Madoff*") (quoting *Silverman v. K.E.R.U. Realty Corp. (In re

Allou Distribs., Inc.)*, 379 B.R. 5, 27 (Bankr. E.D.N.Y. 2007)).  Rule 15(c) should be "liberally

construed."  *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 215 (2d Cir. 1983).  This is

because "[t]he purpose of Rule 15 is to provide maximum opportunity for each claim to be

decided on its merits rather than on procedural technicalities." *Picard v. Fairfield Inv. Fund* (*In

re BLMIS*), No. 08-01789 (CGM), Adv. Pro. No. 09-01239, 2021 WL 3477479, at *12 (Bankr.

S.D.N.Y. Aug. 6, 2021) (quoting *Siegel*, 714 F.2d at 217).  "The principal inquiry . . . is whether

the general fact situation alleged in the original pleading provides adequate notice to the

opposing party of the matters raised in the amended pleading."  *Peter Madoff*, 468 B.R. at 633

(quotations omitted).

New fraudulent transfer claims relate back to the original pleading where the newly alleged transfers occurred as part of the "same 'course of conduct'" as the originally alleged transfers. *Peter Madoff*, 468 B.R. at 633 (citing A*delphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 334 (S.D.N.Y. 2009)).

> In the context of avoidance actions, "each preferential and fraudulent transaction is treated separately and distinctly," *Fabrikant*, 480 B.R. at 492; *accord Metzeler*, 66 B.R. at 984, because the "[p]roof offered for one transaction does not govern as to another and, as such, relation back cannot be ordered between different transactions merely for being similar or arising from the same conduct." *Fabrikant*, 480 B.R. at 492; *accord 360networks*, 367 B.R. at 434 ("a preference action based on one transfer does not put defendant on notice of claims with respect to any other unidentified transfers"). Furthermore, the "mere allegation" that the previously identified transfers and the newly added transfers are "all ... fraudulent transfers does not make them part of the same conduct." *Metzeler*, 66 B.R. at 983; *see also id.* at 984 ("there is no indication that, merely because different transactions bear the same label, relation back is to be ordered on the ground that they arise from similar conduct").

594 B.R. at 210. In *Picard v. KBC Invs. Ltd. (In re BLMIS)*, Adv. Pro. No. 11-02761, 2023 WL 3112719, at *7 (Bankr. S.D.N.Y. Apr. 26, 2023), this Court denied a defendant's motion to dismiss amended claims under similar theories. The claims added to the amended complaint in that proceeding were from same feeder fund to same defendant as the transfers included in the original complaint. The amended transfers were allegedly made within four months of the original transfers and alleged the same BLMIS Account name and number. (Am. Compl. Exs. A, C, Adv. Pro. No. 11-02761, ECF No. 104). In *Peter Madoff*, this Court found reasonable notice in the context of Rule 15 where the defendants "were also named" in the original complaint and the amended claims were made under the "same legal theories as the ones set forth in the Original Complaint . . . ." 468 B.R. at 633.

The Trustee's Original Complaint sought to recover nearly $120 million in transfers from Fairfield Sentry, the Tremont Funds, and the Kingate Funds. (Compl. ¶ 2, ECF No. 1).

Following a settlement with the Kingate Funds, approximately $22,580,321 in transfers from

Fairfield and Tremont Funds remain. (Mem. L. at 5–6, ECF No. 198); (*id.* at 7 n.11); *see also*

(Hr'g Tr. 52:4–20, ECF No. 220).

   The First Amended Complaint asserted approximately $98 million in transfers made by a

feeder fund named Ascot Partners, LP, and by a fourth Tremont-associated feeder fund and an

extra $23,409,029 in transfers allegedly made by the Tremont Funds identified in the Original

Complaint.  The Defendants moved to dismiss these claims as time barred.  *Picard v. BNP*

*Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 209 (Bankr. S.D.N.Y. 2018).  The Trustee argued

these the new claims related back to the original filing "pursuant to Rule 15(C)(1)(b), which

provides for relation back when "the amendment asserts a claim ... that arose out of the conduct,

transaction or occurrence set out – or attempted to be set out – in the original pleading." *Id.* at

209.

   This Court found that the claims asserted for the first time in the First Amended

Complaint "ar[o]se from different facts and circumstances and depend on different proof." *Id*.

The Court explained that "each subsequent transfer, old or new, arose from either separate and

distinct loans, credit facilities or derivative transactions with various counterparties while others

appear to relate to either redemptions or equity distributions to the Defendants as direct investors

in the Tremont Funds." *Id.* at 210–11.  For that reason, the argument that the old and new claims

arose from a common core of operative facts "lack[ed] merit." *Id.* at 211.  The Court further

explained that unlike in other adversary proceedings the claims asserted in this one "were not

part of the common fraudulent scheme or pattern" as each transfer "arose out of a separate

leverage transaction or redemption" and that the Defendants here "were not at the center of a

common scheme to strip assets from BLMIS, but instead, were looking to payments from third

parties." *Id.* at 211–12.

The Second Amended Complaint seeks to recover over $88 million in transfers not

alleged in prior complaints.  These new transfers are set out in the following chart, which the

Defendants compiled in their motion and which is presented in part as follows:

| Alleged Transferor | Alleged Transferee | New Transfers |
|---|---|---|
| Fairfield Sentry | BGL BNP Paribas | $428,837 |
| Fairfield Sentry | BNP Paribas Securities Services Luxembourg | $8,251,780 |
| Fairfield Sentry | BNP Paribas Arbitrage | $20,187,336 |
| Fairfield Sentry | BNP Paribas Cayman | $13,474,091 |
| Fairfield Sentry | BNP Paribas Securities Services | $29,999,235 |
| Fairfield Sentry | BNP Paribas Suisse | $5,657,005* |
| Fairfield Sigma | BGL BNP Paribas | $1,270,142 |
| Fairfield Sigma | BNP Paribas Securities Services Luxembourg | $1,677,928 |
| Fairfield Sigma | BNP Paribas Securities Services | $5,652,076 |
| Fairfield Sigma | BNP Paribas Suisse | $1,231,840 |
| Rye Portfolio Limited | BNP Paribas Cayman | $108,420* |

(Mem. L. at 7–8, ECF No. 198).  Of the amounts listed above, all but two transfers, marked here

with asterisks, are described by the Defendants as "New Relationship Transfers," by which the

Defendants mean that the Trustee had not previously alleged a transfer between that transferee

and relevant fund.  (*Id.*).  The two new transfers marked with asterisks were from Fairfield

Sentry to BNP Paribas Suisse and from Rye Portfolio Limited to BNP Paribas Cayman.  (*Id.*).

The Trustee argues that this Court should permit these transfers as relating back to the

transfers alleged in the Original Complaint due to both "originating from the same Ponzi scheme

identified in the original pleading, because a reasonable defendant would know that the any

receipt of stolen money would be fair game." (Opp'n at 27, ECF No. 200). At the March 27,

2024, hearing, the Trustee argued that this Court's 2018 decision is not dispositive, as the Court

was then considering whether the transactions arose from a specific underlying contract, and did

not consider whether the transactions arose from the same conduct. (Hr'g Tr. 43:7–9 ("[The

Court in 2018] did not assess the conduct that was in the original complaint and whether that

provided notice. It's not there.")). The Trustee argued that under this approach the Court should

find that the

> conduct is their investment into BLMIS through these feeder funds with the purpose
> of investing into BLMIS through these feeder funds, and their receipt of stolen
> customer property through the same feeder funds as part of the same fraud that's
> pleaded in the original complaint. That's how they relate. They all arise under the
> same course of conduct, which under Rule 15 is sufficient to permit relation back.

(*Id.* 42:8–15).

This argument proves too much. *See* 594 B.R. at 210. Allowing the Trustee to add the

New Relationship Transfers to the pleadings would effectively allow any transfers connected to

the BLMIS Ponzi Scheme to be amended to the Complaint. The Court has already found in this

case that new transfers alleged in subsequent amended complaints do not relate back where they

are alleged to relate to previously unnamed initial transferees and where they arose out of

different loans, facilities, or transactions. The Court will grant the Defendants' motion in so far

as it relates to transfers that involve the New Relationship Transfers. With respect to the

transfers which allege relationships between entities that have previously been pled, the Court

finds that the Trustee has met his burden under Rule 15.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss is granted as to the new

relationship transfers and denied as to all other transfers.  The Trustee shall submit a proposed

order within fourteen days of the issuance of this decision, directly to chambers (via EOrders),

upon not less than two days' notice to all parties, as required by Local Bankruptcy Rule 9074-

1(a).



/s/ Cecelia G. Morris

_____

**Dated: June 4, 2024**
**Poughkeepsie, New York**

**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**